[No. 8803.   Department One.   August 8, 1910.]

## J. W. PARKS, *Respondent*, v. S. ELMORE, *Appellant*.[1]

FRAUDS, STATUTE OF—SALES—PERSONAL PROPERTY—STATEMENT OF CONSIDERATION.   Under the statute of frauds of the state of Oregon, requiring a contract for the sale of personal property of the value of over $50 to express the consideration, it is sufficient if the contract, without stating the consideration in express terms, shows mutual promises and it is evident that the promise on one part was the consideration for the promise on the part of the other.

CONTRACTS—MUTUALITY.   A contract whereby plaintiff agreed to pay a certain price for fish during the season, if he purchased any from the defendant, is not lacking in mutuality because optional on the part of the plaintiff, where it contained other stipulations obligating the plaintiff to limit his catch under certain conditions and to deliver all his surplus fish to the defendant at a certain price.

EVIDENCE—CONTRACTS—AMBIGUITY—PAROL EVIDENCE TO EXPLAIN.   In an action upon a contract for the sale by a fish dealer of "my entire catch" of dog salmon, parol evidence is admissible to show that the words "my entire catch" referred to dog salmon which the dealer was compelled to purchase of fishermen in buying silverside salmon and that he did not personally engage in fishing, both parties being familiar with the facts and having operated under a similar contract the year before; since "catch" has not such a definite and fixed meaning as not to admit of explanation under any circumstances.

SALES—CONTRACTS—RESCISSION.   A contract to sell fish during a season is not rescinded by a letter written by the seller to the purchaser before the season began offering to rescind the contract, where the seller made no reply to the letter.

SALES—BREACH BY PURCHASER—DAMAGES—MITIGATION.   It cannot be urged that a recovery for breach of contract to purchase fish, which the seller had to destroy, was excessive, because the plaintiff might by diligence have disposed of the same for some price at a certain cannery, where the fish were offered to the defendant from day to day with notice of the disposition that would have to be made of them, and defendant did not notify the plaintiff of any market for them.

INTEREST—UNLIQUIDATED DEMAND.   Interest will be allowed upon an unliquidated demand that can be ascertained by mere computation, from the time the demand accrues; and a demand for fish sold at a certain price per fish is such a demand.

[1]Reported in 110 Pac. 381.

APPEAL—REVIEW—HARMLESS ERROR. Error in the admission of evidence is harmless in an action tried to the court without a jury.

Appeal from a judgment of the superior court for Chehalis county, Sheeks, J., entered November 6, 1909, upon findings in favor of the plaintiff, after a trial on the merits before the court without a jury, in an action on contract. Affirmed.

*C. W. Hodgdon* and *C. W. & G. C. Fulton,* for appellant.

*John C. Hogan,* for respondent.

FULLERTON, J.—On August 14, 1907, the appellant and respondent entered into a contract evidenced by the following writings:

"Astoria, Ore., August 14, 1907.

"Messrs. Elmore & Co.,

"Astoria, Oregon.

"Gentlemen:—In regard to our conversation this afternoon I hereby make you the following proposition with reference to the fishing on Gray's Harbor and its tributaries for the season of 1907.

"If I purchase any salmon commonly known as the merchantable black salmon from canneries in which you are interested on Gray's Harbor, I will pay you 3-4 cents per lb. over and above the regular cannery price and if you purchase any of the same class salmon from me you will pay me 1-2 cents per lb. over and above the regular cannery price.

"Fish to be weighed when delivered to either party and whatever difference in number of pounds may be remaining to be settled on basis of 21 pounds to the fish.

"Cannery prices to mean prices as paid by the canneries on Gray's Harbor.

"If I obtain any Silversides from you I am to allow 5 cents per fish over and above prices paid by the canneries on Gray's Harbor during the season of 1907, and if you obtain any Silversides from me you are to allow me the same profit, viz: 5 cents per fish over and above the regular price as paid by the canneries on Gray's Harbor. The quantity of Silversides that I will take from you is not to exceed one Silverside for every two dog salmon I deliver you.

"On dog salmon you are to take my entire catch at a price of ten cents (10c) per fish.

"Fish delivered by you to me to be taken from your wharf, and fish delivered by me to you to be taken from my wharf at Aberdeen.

"Owing to the fact that my business makes it a necessity for me to have fish at certain times during the season it will be necessary for you to deliver me fish when I call for them, provided always you have them on hand.

"Whatever surplus fish I may have and you may require will be delivered to you at prices as ruling above.

"This agreement to be in force for season of 1907 only.

　　　　　　　　　"Yours very truly,　　Jas. W. Parks.

"Accepted and entered into as a contract this 14th day of August, 1907.　　　S. Elmore & Co., by W. W. Ridehalgh."

　　　　　　　　　"Astoria, Ore., August 14, 1907.

"Messrs. Elmore & Co.,

　"Astoria, Oregon.

"Gentlemen:—Referring to the contract entered into this day by you and between ourselves, I hereby agree that as far as the dogs are concerned that in case of a heavy run of dog salmon on Gray's Harbor and your gear and the gear of any of the canneries you may be interested in is limited to a certain quantity of fish per boat that I will limit my boats to the same quantity and deliver only that quantity.

　　　　　　　　　"Yours very truly,　　Jas. W. Parks."

On August 30, 1909, the respondent began the present action against the appellant, alleging a breach of the contract on the part of the appellant in that the appellant refused to take any part of his catch of dog salmon during the season of 1907, which amounted to 15,550 fish, and that in consequence he was obliged to throw the same overboard, save a certain quantity which he was able to dispose of at a price of $215.16.

The appellant answered the complaint, admitting the execution of the contract, but denied any breach thereof. He also set up three affirmative defenses; first, that the contract was executed and delivered in the state of Oregon, and was by the laws and decision of that state void and unenforcible, because contrary to the statute of frauds therein; second,

that the contract was void under the laws and decisions of the
courts of the state of Oregon for want of mutuality, in that
it contained no binding obligation on the part of the respond-
ent; and third, that there had been a rescission of the contract
on the part of the respondent. The affirmative allegations
in the answer were put in issue by a reply, and a trial had
before the court sitting without a jury, which resulted in a
judgment in favor of the respondent for the sum of $1,-
422.54. This sum was reached by deducting the sum of
$215.16 from the value of the fish at the contract price, and
allowing interest on the remainder at the legal rate from
December 25, 1907.

Taking up the assignments of error in the order in which
the appellant presents them, the first to be noticed is the con-
tention that the contract is void under the statute of frauds
of the state of Oregon. The statute of that state provides
that an agreement for the sale of personal property at a
price of not less than fifty dollars is void unless the same or
some note or memorandum thereof, expressing the considera-
tion, be in writing and subscribed by the party to be charged,
or by his lawfully authorized agent, or unless the buyer ac-
cept and receive some part of such personal property or pay
at the time some part of the purchase money. (Bellinger
and Cotton's Codes and Statutes of Oregon, § 797.) The
reason given for the contention that the contract in question
falls within this statute, is that it fails to express the con-
sideration for the contract. But to comply with the rule of
the statute, the consideration need not be stated in express
terms. It is sufficient if from the whole writing it appears
with reasonable clearness what the consideration was. It does
so appear we think in the writing before us. It is evident that
it was the purpose of the parties to agree upon a mutual
course of dealing with reference to certain fish procured by
each during the fishing season of 1907. To that end they
made mutual promises which are set forth in the writing, and

the promise on the part of the one furnished a consideration for the promise on the part of the other.

"In those jurisdictions where it is necessary to state the consideration for the promise in the writing the consideration must clearly appear therefrom, but no special form is required for the statement; the consideration need not be expressed in so many words, but may be implied from the instrument. Thus if it appears from the writing that the promisee agrees to do or to forbear to do some act in consideration of the promise, the consideration is sufficiently expressed." 20 Cyc. 266.

Moreover, we think it may be questioned whether a contract of this nature is within the statute of frauds, as construed by the courts of Oregon. In *Hientz v. Burkhard*, 29 Ore. 55, 43 Pac. 866, 54 Am. St. 777, 31 L. R. A. 508, it was held that a contract concerning personal property which did not exist in specie at the time it was entered into, but was required to be thereafter manufactured and brought into being, was not within the statute. On similar principles it would seem that a contract to sell fish in the sea which must be caught before the contract could be fulfilled would fall within the same rule.

The contention that the contract is void for want of mutuality is based on the asserted fact that all of the binding obligations set forth in the contract are on the side of the appellant, while the respondent is at liberty to perform or not perform at his option. But we cannot think this a just deduction from the language of the contract. By a reference thereto it will be observed that the respondent obligated himself to do a number of things; for example, it is recited that his business is such that of necessity he must have fish at certain times and that it will be necessary for the appellant to deliver the fish when he calls for them, and that for such fish he agrees to pay three-fourths of a cent per pound over and above the cannery price for all salmon known as merchantable black salmon, and five cents per pound over and

above such price for all salmon known as silversides that may be delivered him under the contract. Furthermore, he agrees to limit his catch under certain circumstances should it be desired by the appellant, and he agrees to deliver to the appellant all surplus fish which he may have, and the appellant may require, at prices named. These are clearly promises that obligate the respondent, and being so, relieve the contract of lack of mutuality, even if it could otherwise be said that it was so lacking. It was not necessary that the respondent expressly promise to deliver to the appellant his entire catch of dog salmon in order to make this part of the obligation binding upon the appellant. This clause was but one of several in one complete contract, and to make each separate obligation in such a contract binding on the one party there need not be a special promise directed to that particular obligation on the part of the other. The case of *Corbitt & Macleay v. Salem Gaslight Co.*, 6 Ore. 405, 25 Am. Rep. 541, is relied upon to show that under the laws of Oregon contracts like the one at bar are void for want of mutuality. The contract in that case reads as follows:

"Portland, Oregon, December 16, 1875. This is to certify that the Salem Gaslight Company will purchase from Corbitt & Macleay, on arrival of ship from Sydney, Australia, due during the month of March, 1876, one hundred and fifty tons New Castle coal, delivered at Salem, at fourteen dollars per ton of two thousand two hundred and forty pounds. Payment, cash on delivery. Salem Gaslight Co., per Miles M. Miller, Sec'y."

The court held this contract void on two grounds: (1) That there was no mutuality of agreement or obligation; and, (2) that there was no consideration expressed in the writing. In the course of its opinion, however, it expressly distinguishes between writings containing mutual promises signed by both the parties and a unilateral writing such as the one there in question; saying that a promise made by one party is a good consideration for a promise made by the other,

where the promises are concurrent and obligatory upon both parties at the same time. It is manifest, we think, that the present contract falls within the exception to the rule therein stated, rather than within the rule itself.

Parol evidence was introduced by the respondent, over the objection of the appellant, intended to show the relation of the parties at the time the contract was entered into, for the purpose of explaining the meaning of the phrase, "my entire catch," used in the contract in the clause referring to the dog salmon. From this evidence it can be gathered that the appellant owned certain canneries located on Grays Harbor, and was engaged in the business of canning salmon; and that the respondent was engaged in business as a wholesale fish dealer at the same place; that while the respondent owned a few fishing boats which he leased to fishermen for a cash rent, and a fish trap located on a certain stream which he leased for a per centum of the net profits, he owned no fishing gear of any kind, nor did he personally engage in catching fish, through employees or otherwise; and that his method of procuring fish was to induce fisherman to sell to him by paying them fixed prices for their catches.

It appeared also that several different varieties of fish run into the harbor, each in its own season; that among these was a variety known as dog salmon, which was of very inferior quality, having no marketable value except through the canneries, and that these salmon usually ran with another variety known as silversides, which had a high market value and a ready sale. That fishermen while fishing for the silversides would catch in their gear quantities of dog salmon, and fish dealers, in order to procure the silversides, would have to purchase from them the catch of dog salmon; and that it was dog salmon procured in this manner by the respondent that was referred to in the contract by the words, "my entire catch"; that is, such dog salmon as he was compelled to receive in his business as a fish buyer. It appeared, moreover, that the appellant well understood the situation

at the time the contract was entered into; that both parties had been engaged in the fish business on Grays Harbor for a number of years, and that on the previous year they had operated under a similar contract.

The appellant, however, insists that this evidence was inadmissible, and ought not to be considered in determining the meaning of the contract, for the reason that the contract itself is not obscure, that the words "my entire catch" have in themselves a fixed definite meaning, and parol evidence is not admissible to vary their natural sense. And he argues that to permit this sort of evidence to control the contract is to permit the creation of a latent ambiguity by parol evidence, whereas, the rule only permits the explanation of a latent ambiguity by such evidence. But we cannot think the word "catch" has such a definite and fixed meaning as not to admit of explanation under any circumstances. On the contrary, it has a variety of meanings, especially when spoken with reference to fish. In common parlance, for example, when we speak of the catch of a fisherman, the phrase will have different meanings owing to the circumstances under which it is used; it may mean the fish caught by the fisherman individually, or it may mean those caught by him and his assistants, or it may mean those caught with his gear operated by third persons entirely. So when we speak of the catch of a cannery, the phrase may have still a different meaning; it may mean the fish brought to the cannery, without regard to the person by whom they were caught. So in determining the meaning of the phrase "my entire catch" in the case at bar, since it was capable of a variety of meanings, the court was at liberty to inquire into the situation of the parties and give it that meaning the circumstances made evident the parties themselves intended. Taking this evidence into consideration, notwithstanding it is earnestly questioned by the appellant's learned counsel, we have no doubt that it was the purpose of the parties to contract for all of the dog fish the respondent should be obliged to re-

ceive in the course of his business as a wholesale fish dealer, and that the court correctly so decided.

The next contention is that there was a rescission of the contract before the fishing season actually began. This contention is founded on a letter written by the respondent to the appellant in which he offers to rescind the contract if the appellant would consent thereto, but to the letter he received no reply, either in writing or otherwise. This did not amount to a rescission of the contract. On the contrary, it was not within the respondent's power to rescind it without the co-operation of the appellant, and since no reply was sent to his offer, he could not do otherwise than treat the contract as still in force, and act accordingly. It would have been a breach of the contract on his part to have acted otherwise.

It is next insisted that the recovery is too large, both with reference to the amount allowed for the fish destroyed and to the interest account. The respondent testified that he destroyed the dog salmon because there was no market for them, while the appellant insists that the evidence shows they could have been sold at a certain cannery for five cents each. But without entering into a review of the evidence on this point, we think the trial court correct in finding that the respondent used reasonable diligence in his efforts to dispose of the fish before destroying them. Aside from this, the fish were tendered to the appellant almost from day to day, with notice of the disposition that would have to be made of them if they were not called for by the appellant. If the appellant knew of a market he was morally obligated to point it out to the respondent, and failing in this, it would seem that he was not in the best possible position to claim lack of diligence on the part of the respondent.

The court allowed interest on the amount found due at the legal rate from a day in December, 1907, a period of some twenty months prior to the commencement of the action. The appellant insists that the court erred in so doing because, as he argues, interest on unliquidated damages cannot be re-

covered beyond the date of the commencement of the action. The courts are not in harmony on the question, but the general rule is that interest will be allowed on an unliquidated demand, the amount of which can be ascertained by mere computation, from the time the demand accrues. 22 Cyc. 1513. The demand in this case was composed of items thus ascertainable. The price per fish was agreed upon, and the amount recoverable depended upon the number of fish caught.

The remaining assignments need no special consideration. They relate chiefly to the rulings of the court made on the appellant's objections to the admission of evidence, and since the trial was had before the court sitting without a jury, and no question concerning costs is involved, the objections are not material.

The judgment is affirmed.

RUDKIN, C. J., GOSE, MORRIS, and CHADWICK, JJ., concur.